UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DALE S.[1],

                    Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.

Civil Action No. 22-13030

Laurie J. Michelson
United States District Judge

David R. Grand
United States Magistrate Judge

_____/

## <u>REPORT AND RECOMMENDATION ON CROSS-MOTIONS<br>FOR SUMMARY JUDGMENT (ECF Nos. 11, 13)</u>

Plaintiff Dale S. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Currently before the Court for a Report and Recommendation are Plaintiff's Motion for Summary Judgment (ECF No. 11) and the Commissioner's Motion for Summary Judgment (ECF No. 13). Plaintiff also filed a reply brief. (ECF No. 14).

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Plaintiff is not disabled under the Act. Accordingly, the Court **RECOMMENDS** that the Commissioner's Motion for

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

Summary Judgment **(ECF No. 13)** be **GRANTED**, Plaintiff's Motion for Summary Judgment **(ECF No. 11)** be **DENIED**, and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be **AFFIRMED**.

### A.    Background

Plaintiff filed his application for SSI in September 2018, and alleged an amended disability onset date of September 13, 2018, at which time he was 40 years old.  (PageID.8-5, PageID.291; ECF No. 8-2, PageID.33).  He currently lives with his mother, stepfather, and brother.  (ECF No. 8-2, PageID.58).  He completed an associate's degree at a community college.  (*Id.*, PageID.67).  Plaintiff has no past relevant work.  (ECF No. 8-2, PageID.45).  Plaintiff's alleged disabling conditions include post-traumatic stress disorder, severe depressive disorder, and insomnia.  (ECF No. 8-3, PageID.90).

After Plaintiff's application for SSI was denied at the initial level on January 3, 2019 (ECF No. 8-4, PageID.145), he timely requested an administrative hearing, which was held on June 7, 2021, before ALJ Lovert Bassett (ECF No. 8-2, PageID.54-87).  Plaintiff, who was represented by attorney Jim Brown, testified at the hearing, as did vocational expert ("VE") Tobey Andre.  (*Id.*).  On July 15, 2021, the ALJ issued a written decision finding that Plaintiff is not disabled under the Act.  (ECF No. 8-2, PageID.30-46).  On July 25, 2022, the Appeals Council denied review.  (*Id.*, PageID.20-23).  Plaintiff timely filed for judicial review of the final decision.  (ECF No. 1).

The Court has thoroughly reviewed the extensive transcript in this matter, including Plaintiff's medical record, function and disability reports, and testimony as to his conditions and resulting limitations.  Instead of summarizing that information here, the

Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

**B.       The ALJ's Application of the Disability Framework Analysis**

Under the Act, SSI is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at \*7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Plaintiff is not disabled under the Act. At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of September 13, 2018. (ECF No. 8-2, PageID.36). At Step Two, the ALJ found that Plaintiff had severe impairments of asthma, depression, anxiety, and posttraumatic stress disorder. (*Id.*). At Step Three, the ALJ found that Plaintiff's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (*Id.*, PageID.36-37).

The ALJ then assessed Plaintiff's residual functional capacity ("RFC"), concluding that he is capable of performing medium work, with the following additional limitations:

> no exposure to pulmonary irritants, unprotected heights, or dangerous moving machinery; able to understand, remember, and carry out simple job instructions in a routine work setting with few if any changes; no more than occasional interaction with coworkers and supervisors, but must not participate in any collaborative joint projects or engage the public; and should not have a fast-paced job with mandatory numerically strict hourly production quotas but is able to satisfy end-of-the-day employer expectations.

(*Id.*, PageID.38).

At Step Four, the ALJ found that Plaintiff has no past relevant work. (*Id.*,

4

PageID.45).  At Step Five, the ALJ found, based in part on the VE's testimony, that given Plaintiff's age, education, work experience, and RFC, he was capable of performing unskilled medium work as a scrap sorter (90,000 jobs nationally), kitchen helper (200,000 jobs), and hand packager (500,000 jobs).  (*Id.*).  Thus, the ALJ concluded that Plaintiff was not disabled under the Act.  (*Id.*, PageID.46).

### C.   Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted).  The phrase "substantial evidence" is a "term of art …."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).  "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations."  *Id.* (internal citations omitted).  "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence … is 'more than a mere scintilla.'"  *Id.* (internal citations omitted).  Specifically, "[i]t means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (internal citations omitted).

When reviewing the Commissioner's factual findings, the court is limited to an

examination of the record and must consider the record as a whole.  *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

### D.    Analysis

In his motion for summary judgment, Plaintiff raises two arguments.  First, Plaintiff argues that the ALJ failed to adequately support his assessment of the "paragraph B" criteria.  Second, he argues that the ALJ's RFC assessment is not supported by substantial evidence because it was based on an improper rejection of Plaintiff's subjective statements and an unsupported assessment of opinion evidence.  These arguments are addressed in turn below.

1.    *Paragraph B criteria*

i.  <u>Interacting with Others</u>

Plaintiff's first challenge relates to the ALJ's "Paragraph B" analysis at Step Three, in which the claimant's mental limitations in various areas of functioning are analyzed to determine whether they meet or medically equal applicable listings.  Specifically, Plaintiff challenges the ALJ's finding of mild limitations in the area of interacting with others.  As to that issue, the ALJ stated:

> [T]he claimant has a mild limitation.  The claimant reported issues with self-isolation, but he was able to go outside on his own, use public transportation, and go shopping in stores.  He also noted that he spoke with friends on the phone and attended support groups.  Mental status examinations showed the claimant to display good eye contact and intact speech.  He was also noted to have cooperative behavior.  The claimant was never observed with irritable affect, and he was not observed as having issues communicating with treating sources.  For these reasons, he is found to have no more than mild limitation in this domain of functioning.

(ECF No. 8-2, PageID.37).

Plaintiff argues that the ALJ "acknowledged issues with self-isolation," but improperly suggested that such issues were "canceled out" by his ability to engage in daily activities and his behavior during treatment.   (ECF No. 11, PageID.2933).   The Commissioner responds that the ALJ was not relying on Plaintiff's activities or observed behavior during treatment "as being the equivalent to an ability to perform competitive work," but rather "was permissibly considering this evidence in evaluating the severity" of Plaintiff's mental impairments. (ECF No. 13, PageID.2951).  The Court finds no reversible error by the ALJ in this regard.

As to Plaintiff's daily activities, the ALJ permissibly considered that, despite his reports of self-isolation, the record showed that Plaintiff went out into the public when using public transportation and shopping in stores, and further interacted with others by speaking with friends over the phone and attending support groups.  The law is clear that while "minimal daily functions" are not necessarily "comparable to typical work activities," evidence of daily activities "cannot be ignored," particularly "when mental disorders are in play, as they are here."  *Neal v. Comm'r of Soc. Sec.*, No. 18-10709, 2019 WL 2208555, at *11 (E.D. Mich. Jan. 31, 2019); *see also* 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00F(3)(b)-(c) ("Areas of mental functioning in daily activities.  You use the same four areas of mental functioning in daily activities at home and in the community that you would use to function at work . . . information about your daily functioning can help us understand whether your mental disorder limits one or more of these areas; and, if so, whether it also affects your ability to function in a work setting . . ."); *Sadger v. Comm'r of Soc. Sec.*, No. 2:20-CV-11900, 2021 WL 4784271, at *9 (E.D. Mich. Aug. 23, 2021) ("The ALJ is responsible for assessing residual functional capacity and takes into account all of the relevant medical and other evidence in doing so.  This includes statements about the claimant's abilities provided by medical sources, whether or not they are based on formal medical examinations, and non-medical statements from the claimant or others, including those regarding daily activities.") (citations omitted).

In this case, the record evidence reflects that, in his function report, Plaintiff reported that he "strives" to go outside at least 3 times per week, he can "often" go out alone, drive a car, use public transportation, and shop in stores for groceries and household necessities

8

"roughly twice a week." (ECF No. 8-6, PageID.345, 349). Plaintiff also reported going to therapy, spending time in support groups, and talking with people on the phone and/or the computer twice per week, and that on a more regular basis, he attends doctor's appointments, therapy appointments, support groups, food pantries, and grocery stores. (*Id.*, PageID.346). Treatment notes also reflect that Plaintiff was involved in a community knitting group, which he "describes enjoying" (ECF No. 8-9, PageID.1731), he had eventually "been asked to instruct [knitting] classes" (ECF No. 8-7, PageID.1007), and he even volunteered at the Heartland Health Clinic because he "like[s] to help people successfully integrate into the support group [he is] in at Heartland" (ECF No. 8-7, PageID.992). Collectively, Plaintiff's engagement in such activities constitutes substantial evidence supporting the ALJ's findings of mild limitations in interacting with others.[2]

Moreover, the ALJ did not solely rely on evidence of Plaintiff's daily activities, but also considered mental status exam findings related to his ability to interact with others, including that Plaintiff routinely maintained good eye contact and intact speech, exhibited cooperative behavior, and was not observed with having an irritable affect or issues with communication. (ECF No. 8-2, PageID.37). While the record certainly contains evidence favorable to Plaintiff showing him to appear sad, tearful, and with pressured speech, tangential thought process, depressed mood, and blunted affect, his lengthy medical history contains few, if any, treatment notes stating that Plaintiff had issues in appropriately

---

[2] Plaintiff's argument that activities such as "taking a bus, going out alone, and shopping are all inherently solitary activities" that do not reflect "an ability to actually interact with others in 'the real world'" lacks merit. (ECF No. 11, PageID.2933). Certainly, at a minimum, taking a public bus and shopping are "real world" activities that involve interacting with others.

interacting with treatment providers or their staff.  (*See, e.g.,* ECF No. 8-7, PageID.997 (sad mood/affect, soft/pressured speech, logical and tangential thought process, but intact memory, unimpaired insight, and "extremely self aware and functioning within normal limits" in November 2018); ECF No. 8-7, PageID.1007 (depressed/anxious mood, sad/flat affect, but normal judgment, orientation, cognition, and fair insight)).  To the contrary, numerous medical records document Plaintiff as being pleasant, friendly, personable, cooperative, and well-spoken in most of his interactions during treatment.  (*See, e.g.*, ECF No. 8-9, PageID.1731-32 (QMHP Shaina Campbell noting in August 2018 that Plaintiff was "cooperative" and "friendly and well spoken"); ECF No. 8-7, PageID.622 (same in October 2018); ECF No. 8-7, PageID.1063-64 (psychologist Jauren D. Kelly concluding in  November 2018 that Plaintiff was cooperative throughout the interview and made good eye contact); ECF No. 8-7, PageID.1209 (case manager Stephanie Bright noting that Plaintiff "responds well to one on one interractions [sic]"); ECF No. 8-8, PageID.1461 (case manager Stephanie Bright noting in October 2019 that Plaintiff's strengths are that he is "friendly, considerate, and articulate"); ECF No. 8-13, PageID.289 (July 2020 initial assessment with E. Gonzalez Counseling, PLLC, noting Plaintiff was friendly and open to conversation); ECF No. 8-9, PageID.1851 (Dr. Ross Halpern noting in November 2020 that Plaintiff "was very pleasant, personable and motivated, verbose"); ECF No. 8-10, PageID.2009 (Washtenaw County Community Mental Health assessment in December 2020 noting Plaintiff as "pleasant but guarded")).

   To the extent Plaintiff takes issue with the ALJ's reliance on his observed behavior during treatments, courts in this circuit have noted that "attending doctor's appointments

and group therapy sessions" support a claimant's ability to interact with others, *Blain v. Comm'r of Soc. Sec.*, No. 1:17-CV-844, 2018 WL 4178200, at *5 (W.D. Mich. Aug. 15, 2018), and that a mild limitation in social functioning can be supported by a claimant "appear[ing] to have no limitations interacting at the hearing with his representative or the undersigned," *Bouschor v. Colvin*, No. 2:15-CV-47, 2016 WL 336099, at *4 (W.D. Mich. Jan. 28, 2016). *See also Sadger*, 2021 WL 4784271, at *8 ("Other cases have noted that 'attending doctor's appointments and group therapy sessions' support a claimant's ability to interact with others") (citations omitted); *Trejo v. Comm'r of Soc. Sec.*, No. 16-11537, 2017 WL 3768943, at *2 (E.D. Mich. Aug. 31, 2017) (claimant's "ability to perform household chores, his interactions with family, and his cooperation at his hearing before the ALJ" supported a mild limitation in claimant's RFC). Thus, the medical notes detailed above reflecting Plaintiff's friendly, personable, cooperative, and well-spoken behavior during his numerous mental health treatments serve as substantial evidence supporting the ALJ's finding of mild limitations in interacting with others.[3]

In sum, Plaintiff fails to show reversible error in the ALJ's finding of mild limitations in the area of interacting with others, which is supported by substantial evidence in the record.

---

[3] To the extent Plaintiff argues that the ALJ ultimately imposed greater restrictions in the RFC finding than the "mild" limitation found in the paragraph B analysis, that does not mean the ALJ erred. As the ALJ expressly explained, "the limitations identified in the 'paragraph B' criteria are not a [RFC] assessment," and "[t]he mental [RFC] assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning." (ECF No. 8-2, PageID.37).

ii.  Concentrating, Persisting, and Maintaining Pace

Plaintiff also challenges the ALJ's Paragraph B finding of moderate limitations in the area of concentrating, persisting, and maintaining pace.  In this regard, the ALJ stated:

> With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation.  The claimant reported issues with perseveration and intrusive thoughts, but he noted that he was able to prepare meals and use public transportation.  Mental status examinations showed him to have intact attention and concentration.  He was never observed as responding to internal stimuli.  He was noted as having good impulse control.  He was not observed as having distractible thought process or requiring redirection.  The claimant enjoyed knitting and drawing, activities that require an extended period of focus to complete.  For these reasons, he is found to have no more than moderate restriction in this domain of functioning.

(ECF No. 8-2, PageID.37).

Based on the above, Plaintiff argues that the ALJ "proposed some startingly false equivalencies" in assessing Plaintiff's ability to concentrate, persist, and maintain pace, such as when the ALJ "canceled out" Plaintiff's reported issues with perseveration and intrusive thoughts by pointing to his ability to prepare meals and use public transportation. (ECF No. 11, PageID.2934).  The Commissioner responds that "the ALJ did not conclude that Plaintiff's activities cancelled out his mental health symptoms; rather, the ALJ was comparing all of the evidence for this factor and concluded that overall, Plaintiff had moderate limitations."  (ECF No. 13, PageID.2957).   The Court agrees with the Commissioner that a fair reading of the ALJ's decision does not reflect a "cancelling out" of Plaintiff's issues with perseveration and intrusive thought, but rather reasonable consideration and weighing of those issues along with other relevant evidence of daily activities in order to assess the *severity* of his limitations in this area.  *See Neal*, 2019 WL

12

2208555, at *11.

The ALJ's finding of moderate limitations in concentrating, persisting, and maintaining pace is supported by substantial evidence. For instance, treatment records support the ALJ's determination that mental status exams generally showed Plaintiff as having intact attention and concentration. (*See, e.g.*, ECF No. 8-12, PageID.2426-67 (Dr. Alyssa Stevenson, M.D., noting in July 2020 that Plaintiff's attention and concentration were intact to interview); *id.*, PageID.2459 (August 2020 progress note from Dr. Rahul Dasgupta, M.D., noting attention and concentration were within normal limits); *id.*, PageID.2478-79, 2505 (Dr. Scott noting twice in September 2020 that Plaintiff's attention and concentration were intact to interview); *id.*, PageID.2596 (August 2021 MPACT Psychiatry Consultation finding attention and concentration intact to interview)). Plaintiff also reported in his function report that he sometimes prepares "more complex meals with more courses" that can take up to more than two hours, and that he even "search[es] out and shop[s] sales for most items," which "may take hours." (ECF No. 8-6, PageID.344-45). Treatment records further support the ALJ's determination that Plaintiff was never observed as responding to internal stimuli and as generally having good impulse control. (*See, e.g.*, ECF No. 8-11, PageID.2377 (June 2019 CANS assessment finding good impulse control); ECF No. 8-12, PageID.2459 (August 2020 progress note finding impulse control was adequate within the context of interview); *id.*, PageID.2478-79 (Dr. Scott noting in September 2020 that Plaintiff did not appear to respond to internal stimuli, and instead that his "current living situation is reportedly severely stressful for him"); *id.*, PageID.2596 (August 2021 MPACT Psychiatry Consultation finding that Plaintiff "did not appear to

13

respond to internal stimuli").

Finally, Plaintiff does not dispute that his hobbies included drawing and knitting, nor that such activities can generally involve extended periods of focus.  *See* ECF No. 8-9, PageID.1731-32 (Plaintiff reporting in August 2018 mental health assessment that he "enjoys creative and artistic activities such as drawing or knitting" and "recently joined a knitting group"); ECF No. 8-7, PageID.622 (QMHP Campbell noting Plaintiff enjoys drawing and knitting); *id.*, PageID.992 (Plaintiff reporting in November 2018 that he attends knitting group"); *id.*, PageID.1007 (Plaintiff asked to instruct community knitting group classes in February 2019); ECF No. 8-10, PageID.2012 (December 2020 initial assessment at Washtenaw County Community Mental Health reflecting that Plaintiff's "community involvement/personal interests" include drawing, art, games, video games). Thus, it was reasonable for the ALJ to consider such activities, along with the record as a whole, in determining that Plaintiff was moderately limited in the area of concentration, persistence, and pace, and that determination is supported by substantial evidence.

### iii.  Medical Equivalency

Plaintiff next argues that "the ALJ never explained how, even if there is no support for a finding that Plaintiff's combined mental impairments meet the strict requirements for listing level severity, they are not, at the very least, equivalent."  (ECF No. 11, PageId.2934).  "When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th

Cir. 2004). It is the claimant's burden to show that he meets or equals the listed impairment. *Id.*

The Commissioner argues that Plaintiff "fails to even identify what listing he allegedly medically equals, let alone show how the medical evidence equals the relevant criteria for the listing in question." (ECF No. 13, PageID.2958). The Court agrees. Plaintiff fails to identify a specific listing that he meets or medically equals, much less carry his burden to point to specific evidence demonstrating how he meets or equals the elements of such listing. This alone is sufficient basis to reject Plaintiff's medical equivalency argument. *Thacker*, 93 F. App'x at 728.

In any case, to the extent Plaintiff points to the opinion of his case manager, Stephanie Bright, or to certain treatment records with Dr. Ross Halpern, Ph.D., L.P., or therapist Karen Larkins, M.A., C.R.C., L.P.C., as establishing medical equivalency, such arguments are unconvincing. First, the ALJ permissibly found Bright's opinion not to be persuasive based in part on the fact that it was based primarily, if not entirely, on Plaintiff's subjective reports. *See Tate v. Comm'r of Soc. Sec.*, 467 F. App'x 431, 433 (6th Cir. 2012) (finding the ALJ gave sufficient reasons for discounting the opinion of claimant's treating physician where the treating physician's "assessment appeared to be based on [claimant's] subjective complaints, without sufficient support from objective clinical or neurological findings."); *see also Hague v. Comm'r of Soc. Sec.*, No. 20-13084, 2022 WL 1055457 (E.D. Mich. Feb. 1, 2022) ("An ALJ disregarding a medical opinion due to the provider's reliance on a claimant's subjective complaints is supported by substantial evidence."). A review of Bright's July 2019 report reflects that she did in fact rely almost entirely on Plaintiff's

subjective complaints in opining that he had marked restrictions in mental functioning.  For example, she opined that his "illness markedly restrict[s] daily activities" because "***client reports symptoms restrict daily activities,***" and his "illness markedly impact[s] upon the ability to sustain concentration and attention, resulting in frequent failure to complete task" because "***client reports inability to independently complete phone calls or paperwork.***" (ECF No. 8-7, PageID.1208-09) (emphasis added).  Bright also expressly stated that it was "unknown" what may "cause" or "trigger" Plaintiff's symptoms, other than that "***client reports inability to be productive due to stress***," and acknowledges that she had "not observed [Plaintiff] in social situations." (*Id.*).  Indeed, as it relates to what Bright actually observed herself, she states only that Plaintiff "responds well to one on one interractions [sic]." (*Id.*).[4]

Second, while Plaintiff is correct that Dr. Halpern "believed Plaintiff needed a higher level of care than he was able to provide," and that therapist Larkins noted "significantly impeded progress, a fragile emotional state, and heightened symptoms resulting from external stressors," it was reasonable for the ALJ to determine, based on the record as a whole, that Plaintiff's symptoms were often exacerbated by "external stressors, such as relationships with family and neighbors," and that treatment notes largely focused on such "external stressors rather than treatment of his mental health impairments." (ECF No. 8-2, PageID.43).

As to Dr. Halpern, the medical record reflects that, in November 2020, Plaintiff

---

[4] By the end of Plaintiff's case management with Bright on October 2, 2019, his "closing GAF score" was 66, which reflects *mild* symptoms.  (ECF No. 8-8, PageID.1460).

underwent an initial evaluation with Dr. Halpern, during which Plaintiff was pleasant, personable, open, honest, answered all questions without hesitation, and was analytical and verbose, but was "highly depressed and highly stressed *because of his living situation*" (ECF No. 8-9, PageID.1849) (emphasis added), and that in December 2020, Plaintiff continued to report struggles with anxiety and depression, as he was "*currently living with his parents in an environment that is triggering*" (ECF No. 8-9, PageID.1848) (emphasis added). By January 25, 2021, Plaintiff's treatment with Dr. Halpern was terminated because Plaintiff endorsed severe symptoms and behaviors, "such as urinating in his room and severe paranoia," which led Dr. Halpern "to believe patient needed a higher level of care th[a]n this therapist was able to provide." (ECF No. 8-9, PageID.1847). A closer review of the record evidence, however, reflects that the urinating behavior was not involuntary, and was related to the external stressor of living with his family; the medical record reflects that Plaintiff reported the "difficult situation in his home" led him to "avoid even leaving his room and has been urinating in bottles in his bedroom." (ECF No. 8-12, PageID.2421). Such records connect Plaintiff's symptoms and behaviors to his current living situation at home with his family. Finally, to the extent Dr. Halpern noted that Plaintiff needed a higher level of care than he could provide, it is salient that the psychotherapy treatment plan Dr. Halpern had recommended on December 14, 2020, focused on more modest interventions such as EDMR (eye movement desensitization and reprocessing), "mindfulness," and "developing skills related to processing his trauma and healthy coping skills" (ECF No. 8-9, PageID.1848), and the fact that Plaintiff needed a higher level of care than such modest interventions is not inconsistent with the ALJ's

finding that Plaintiff had moderate limitations in mental functioning.

Similarly, as to therapist Larkins, the record reflects that she wrote a letter on June 1, 2021, noting that Plaintiff "has been receiving Telehealth Therapy, two times per week, for behavioral issues associated with Major Depressive Disorder, and Post Traumatic Stress Disorder," since April 5, 2021.  (ECF No. 8-13, PageID.2918).  Larkins noted that Plaintiff's "progress has been significantly hampered, ***due to his current living situation***," and that his "emotional stability is very fragile at this time . . . ***[as] frequent stressors in the home dynamic and environment*** have contributed to [Plaintiff] experiencing heightened mental anxiety."  (ECF No. 8-13, PageID.2918) (emphasis added).  Such letter is consistent with the ALJ's finding that treatment notes largely focused on external stressors.[5]

In sum, Plaintiff has failed to show reversible error in the ALJ's articulation or assessment of the paragraph B criteria, which is supported by substantial evidence.

### 2. RFC Assessment

Plaintiff next argues that "the ALJ's RFC assessment arises out of an unsupportable rejection of Plaintiff's subjective statements as well as an unsupported assessment of opinion evidence."  (ECF No. 11, PageID.2935).  For the reasons discussed below, the Court disagrees, and finds that the ALJ's RFC is supported by substantial evidence in the record.

---

[5] To the extent Dr. Larkins opined that Plaintiff's "current diagnoses render him incapable of engaging in substantial, gainful employment" (ECF No. 8-13, PageID.2919), that opinion is not entitled to any deference, as it is a statement on an issue reserved to the Commissioner.  *See* 20 C.F.R. § 416.920b(c)(3)(i).

i.  <u>Subjective Statements</u>

As to Plaintiff's subjective complaints, the ALJ stated:

[T]he medical evidence of record is not supportive of the claimant's allegations of disabling symptomatology.  While the claimant received treatment for depression and posttraumatic stress disorder at a number of mental health centers, the treatment notes from these clinics focused primarily on external stressors, such as relationships with family and neighbors, and applying for his disability claim.  The claimant was recommended a number of times to try antidepressant medications, but declined to do so.  In July 2019, the claimant's therapist completed a questionnaire addressing the claimant's ability to function in a workplace.  Following the completion of this paperwork, the claimant only returned to this therapist once more before missing a number of scheduled appointments and eventually being discharged from treatment in October 2019.

There is nearly a year-long gap for any mental health treatment again until July 2020, when he had an initial assessment at E. Gonzalez Counseling, but he was again discharged shortly after starting treatment when he was unable to complete an intake packet.  He did see a psychiatrist in July 2020, as well, but subsequent visitations were far apart and noted that the claimant was not taking medications prescribed to him.  He started seeing psychologist Dr. Halpern in November 2020, but his treatment was again discontinued shortly thereafter, this time because the claimant's reports of symptoms were considered too severe for the level care Dr. Halpern could provide.  This brief treatment relationship was followed by an initial assessment at Washtenaw County Community Mental Health, where the claimant again declined additional medication treatment or treatment with a psychiatrist.  A letter from therapist Karen Larkins noted that the claimant started telehealth therapy with her in April 2021, with most of the visitations focusing on the claimant's living situation.  While a letter from Amplify Colectivo indicated that the claimant also received regular therapy there from July 2020 through January 2021, the description of the visits focused primarily on the treatment modalities used for the claimant rather than the claimant's condition and reception to treatment.

The claimant's mental health treatment focuses primarily on therapy, with treatment notes focusing on the claimant's external stressors rather than treatment of his mental health impairments.  Furthermore, there is consistent evidence of the claimant engaging in noncompliance,

declining additional medical treatment, and being discharged from
therapy shortly after starting for a number of reasons.  Despite this
noncompliance and conservative treatment compliance, the claimant's
symptoms never worsened to the extent that they required emergency
room visitations or inpatient hospitalizations.  Ms. Larkins's June 2021
letter suggested that the claimant had been to the emergency room for
mental health symptoms, but there is no evidence of the claimant ever
being seen in the emergency room secondary to worsening depression
or anxiety.  The claimant described a living situation that required him
to self-isolate after moving in the summer of 2020, but treatment notes
prior to then showed the claimant as being more engaged in activities,
such as regularly attending a community knitting group.  The claimant's
treatment notes indicate that his worsening of symptoms was in relation
to his living situation rather than a complete inability to function.  While
he reported having a fear of water due to past traumatic events, he was
never observed as having poor grooming or hygiene.

(ECF No. 8-2, PageID.42-43) (citations omitted).

Plaintiff first takes issue with the ALJ's discrediting of his subjective complaints as

to the severity of his mental impairments based on the fact that his treatment notes focused

primarily on external stressors, even though "the fact that external stressors have such a

significant impact on Plaintiff's functioning would strongly suggest that the stressors

attendant to full-time employment would prove even more problematic."  (ECF No. 11,

PageID.2935-36).  He thus contends that "[t]he ALJ's findings appear to be based solely

upon [the ALJ's] own skepticism, cherry-picking, and inferences that are improper."  (*Id.*).

Plaintiff's argument lacks merit, as substantial evidence in the record in the form of

numerous treatment notes consistently emphasize Plaintiff's housing situation and his

relationship with his neighbor/family as a significant cause of his depression and anxiety

symptoms, rather than an inherent inability to function.

For instance, between 2018 and 2019, treatment notes document recurring issues

with Plaintiff's angry downstairs neighbor, who would harass Plaintiff and cause him to experience increased depression and stress.  (*See* ECF No. 8-9, PageID.1728 (August 2018 therapy note indicating that his "living situation is stressful" because his downstairs neighbor gets angry at him for being too noisy); ECF No. 8-7, PageID.733 (September 2018 therapy note indicating that Plaintiff experienced increased depression over the past week, particularly "when he experiences his downstairs neighbor's nosiness"); ECF No. 8-7, PageID.622 (reporting in October 2018 that "his living situation is stressful because his downstairs neighbor is harassing him"); ECF No. 8-8, PageID.1460-61 (case manager Bright noting in October 2019 that Plaintiff presented with symptoms of anxiety and depression with case management needs "in the area of housing and benefit management," that his "[g]oals of housing [were] not achieved," and he reported "increasing symptoms due to moving out of state.").

After Plaintiff moved back to Michigan in 2020 and moved in with his family, treatment notes routinely reflect that his housing situation was a substantial trigger to his mental symptoms and caused him to "continue[] with significant depressive and anxiety symptoms, mostly in the context of conflict with his stepfather" (ECF No. 8-12, PageID.2472), who "doesn't want him living in the home" (ECF No. 8-13, PageID.2987-89).  *See also*, *e.g.*, (ECF No. 8-13, PageID.2987-89) (reporting in July 2020 a "challenging living situation in which he barely leaves his room" and that "his parents make it challenging to live in the home by slamming doors, which is triggering"); (ECF No. 8-12, PageID.2421) (Dr. Alyssa Stevenson, M.D., noting in July 2020 that Plaintiff was "despondent and depressed" in the setting of "multiple stressors," including "a difficult

21

relationship with his parents" and "a difficult situation in his home"); (ECF No. 8-12, PageID.2480) (Dr. James Alexander Scott, M.D., from Michigan Medicine noting in September 2020 that Plaintiff's "current living situation is reportedly severely stressful for him"); ECF No. 8-12, PageID.2498 (reporting in September 2020 "significant depressive and anxiety symptoms, mostly in the context of conflict with his stepfather," and that he "will be yelled at" and "emotionally abused" if heard making noises in the home); ECF No. 8-12, PageID.2506 ("his housing situation is a source of extreme stress for him"); ECF No. 8-9, PageID.1849 (Dr. Halpern noting in November 2020 that Plaintiff reported being "highly depressed and highly stressed because of his living situation"); ECF No. 8-9, PageID.1848 (reporting in December 2020 that Plaintiff is "currently living with his parents in an environment that is triggering"); ECF No. 8-10, PageID.1993 (progress note in January 2021, showing Plaintiff seeking services because "his home life is not good and he does not feel supported at home," and he is "currently working towards receiving social security and would like to move out on his own."); ECF No. 8-12, PageID.2587-88 (MPACT Psychiatry Consultation in April 2021 in which Plaintiff reported that living with his family was "toxic" and a "significant part of his current stress and anxiety level").

Indeed, treatment records also consistently recognize Plaintiff's housing situation as having a significant impact on his mood and PTSD symptoms, and even assess treatment plans recommending a change in housing situation to benefit his PTSD and depression. (*See, e.g.*, ECF No. 8-7, PageID.998 (Dr. Megan Dyer, M.A., L.P.C., noting in November 2018 that Plaintiff reported being "able to live in a more positive way" when he had moved out of his family's house in the past at 23 years old, and assessing that, now that he has

moved back in with his family, Plaintiff may benefit from "different housing referrals");

ECF No. 8-12, PageID.2480 (Dr. Scott assessing in September 2020 a plan to "speak with

housing social work" to discuss housing); ECF No. 8-12, PageID.2588 (psychiatry

consultation in April 2021 indicating Plaintiff reported that "due to his current living

situation, he is unable to do things that he would normally enjoy such as exercising or

cooking"); ECF No. 8-13, PageID.2918 (Dr. Larkins assessing in June 2021 that Plaintiff's

"progress has been significantly hampered, due to his current living situation," and that his

"emotional stability is very fragile at this time," noting "frequent stressors in the home

dynamic and environment" as significant factors).

Based on the above, Plaintiff's argument that the external stressors the ALJ

identified relating to specific family members or neighbors are indicative of his inability to

function in a work environment is speculative. *Duha v. Agrium, Inc.*, 448 F.3d 867, 879

(6th Cir. 2006) ("Arguments in parties' briefs are not evidence"). Treatment notes

document a harassing and abusive relationship between Plaintiff and his neighbor/family,

which is not necessarily akin to the standard relationship in a basic work environment. In

sum, substantial evidence supports the ALJ's finding that Plaintiff's mental health

treatment notes routinely focused on external stressors and indicated that his worsening of

symptoms was in relation to his living situation rather than an inability to function.

Second, Plaintiff argues that the ALJ's decision reflects a "regrettable

misunderstanding of mental illness and how it is addressed within the context of Social

Security disability adjudication" because the failure to seek treatment is another symptom

of the disorder itself, and that the ALJ improperly "continued to focus on gaps in

treatment." (*Id.*, PageID.2936-37).  The Sixth Circuit has stated that "ALJs must be careful not to assume that a patient's failure to receive mental-health treatment evidences a tranquil mental state.  For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009).  "While the ALJ [is] required to consider any explanations for plaintiff's failure to seek out medical treatment, [where] plaintiff has offered none for the ALJ to consider, [t]here is no basis to reverse the ALJ's decision." *Bott v. Colvin*, 2017 WL 2806822, at *11 (E.D. Mich. May 31, 2017).  Moreover, where there is no evidence in the record explaining gaps of time in a claimant's treatment, "[a] 'reasonable mind' might therefore find that the lack of treatment during the [] time frame indicated an alleviation of [claimant's] symptoms." *White*, 572 F.3d at 283-84.

Here, the ALJ's decision noted consistent evidence of Plaintiff "engaging in noncompliance, declining additional medical treatment, and being discharged from therapy shortly after starting for a number of reasons." (ECF No. 8-2, PageID.43).  More importantly, the ALJ's discussion on Plaintiff's non-compliance or failure to seek or follow through on certain treatments was "only one of several factors supporting the ALJ's conclusion that [claimant's] mental disorders were not disabling . . . [and so] the ALJ's view of [claimant's] failure to obtain mental health treatment does not [by itself] warrant relief." *Springer v. Comm'r of Soc. Sec.*, 451 F. Supp. 3d 744, 763 (E.D. Mich. 2020).  Indeed, in addition to the ALJ's finding regarding external stressors discussed above, the ALJ also expressly found that "***despite this noncompliance*** and conservative treatment compliance, [Plaintiff's] symptoms never worsened to the extent that they required

emergency room visitations or inpatient hospitalizations." (ECF No. 8-2, PageID.43) (emphasis added). Such finding is supported by substantial evidence in the record.

Specifically, Plaintiff does not dispute that his medical record reflects that he has had no previous inpatient psychiatric hospitalizations. (*See e.g.*, ECF No. 8-10, PageID.2009) (reporting "no previous inpatient psychiatric hospitalizations" in December 2020). To the contrary, treatment notes reflect that Plaintiff was consistently assessed as "appropriate for continued *outpatient* treatment," and that "there are no acute safety concerns." (ECF No. 8-12, PageID.2597) (emphasis added) (MPACT Psychiatry Consultation in April 2021); *see also, e.g.*, ECF No. 8-7, PageID.1105 (February 2019 CANS assessment noting provider could "not see reason for hospitalization or more intensive treatment needed at this time"); ECF No. 8-12, PageID.2428 (July 2020 treatment note with Dr. Stevenson at Michigan Medicine assessing no acute safety concerns and that Plaintiff "remained appropriate for outpatient treatment"); ECF No. 8-12, PageID.2506 (September 2020 treatment note with Dr. Scott at Michigan Medicine assessing outpatient treatment remained appropriate). The ALJ also recognized that therapist Larkins' letter in June 2021 had suggested that Plaintiff's mental symptoms "contributed to [him] going to the Emergency Room, periodically, for medical attention and intervention" (ECF No. 8-13, PageID.2918-19), but reasonably determined that "there is no evidence of the claimant ever being seen in the emergency room secondary to worsening depression or anxiety." (ECF No. 8-2, PageID.43). Plaintiff does not dispute this finding, much less point to evidence demonstrating emergency room or inpatient treatment for mental symptoms.

Instead, Plaintiff asserts that "[t]he ALJ failed to explain why an absence of

psychiatric hospitalizations justifies a leap to a finding that one's mental impairments, in combination, are not work-preclusive."  (ECF No. 11, PageID.2937).  Such assertion is misguided, as it fails to recognize that the ALJ merely considered the lack of hospitalizations or in-patient care as one of several factors in assessing the consistency of Plaintiff's subjective complaints as to the severity of his symptoms with his more conservative mental health treatment regimen focused primarily on outpatient therapy.  *See Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 335 (6th Cir. 2007) ("[The doctor's] modest treatment regimen for [claimant] is inconsistent with a diagnosis of total disability. Although [claimant] challenges this characterization, he admits he has never been hospitalized for mental or physical problems . . . and never received in-patient mental health counseling"); *see also Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 678 (6th Cir. 2013) (A "conservative treatment approach suggests the absence of a disabling condition").  The ALJ did not place undue emphasis on Plaintiff's lack of hospitalizations.

Moreover, to the extent Plaintiff argues that the ALJ "held fast to his false equivalencies and leaps of logic" by stating that despite Plaintiff's reports of fearing water due to a past traumatic drowning event, he was never observed as having poor grooming or hygiene, the Court finds no error in this regard.  (ECF No. 11, PageID.2938).  The medical record reflects that Plaintiff reported that he struggles with showering and bathing. *See, e.g.*, ECF No. 8-9, PageID.1728 (mental health assessment in August 2018, during which Plaintiff reported struggling with showering and bathing); ECF No. 8-7, PageID.622 (Treatment Plan review in October 2018 noting Plaintiff reported that he struggles with showering and bathing).  However, treatment records consistently reflect that Plaintiff was

well groomed and had adequate hygiene.  (ECF No. 8-7, PageID.1074 (Dr. Sarah Johnson, M.D. observing in December 2018 that Plaintiff was "well groomed"); ECF No. 8-13, PageID.2895 (counseling assessment in July 2020 observing Plaintiff was "groomed appropriately"); ECF No. 8-7, PageID.1063 (November 2018 consultative exam with psychologist Kelly observing Plaintiff's hygiene "appeared fine"); ECF No. 8-7, PageID.1230 (mental status assessment in June 2019 reflecting adequate hygiene); ECF No. 8-10, PageID.1918 (progress note in March 2021 observing Plaintiff presented with good hygiene).  Indeed, during a mental health assessment in August 2018, QMHP Shaina Campbell expressly recognized the discrepancy between Plaintiff's reported struggles with bathing or shaving and her objective observations of his current state at the time of assessment, noting that "[d]espite his reported difficulties with bathing and shaving[,] at intake [Plaintiff] has presented as well groomed in sessions." (ECF No. 8-9, PageID.1731-32).  Likewise, it was reasonable for the ALJ to conclude that Plaintiff's subjective complaints as to his struggles with bathing, showering, or shaving were inconsistent with evidence in the record routinely documenting his adequate hygiene and grooming.[6]

Finally, Plaintiff argues that limitations to "simple, repetitive tasks or to unskilled work [are] not necessarily sufficient to account for moderate [] difficulties" in

---

[6] In addition, Plaintiff stated in his function report that his "intense fear of water since childhood trauma" affected his ability to "drink water," but treatment records reflect that Plaintiff was routinely observed as well-hydrated.  *See, e.g.*, ECF No. 8-7, PageID.788 (October 2018 exam showing Plaintiff appeared "well nourished, well hydrated"); *id*., PageID.1174-75 (February 2019 exam with Dr. Sarah Johnson, M.D., noting Plaintiff appeared well hydrated); *id*., PageID.1160 (same in April 2019).  Such records also serve as substantial evidence supporting the ALJ's finding as to Plaintiff's subjective complaints.

concentrating, persisting, and maintaining pace.   (ECF No. 11, PageID.2938).   That argument lacks merit.   First, the ALJ did not only limit Plaintiff to unskilled or simple, routine, and repetitive work; rather, the ALJ found that the work setting can have only few if any changes, and that it should not be a fast-paced job with mandatory numerically strict hourly production quotas and instead only require satisfaction of end-of-the-day employer expectations.   (ECF No. 8-2, PageID.38).   Second, "[f]indings of moderate limitations in concentration, persistence, or pace do not necessarily preclude 'simple, routine, unskilled work," and "a limitation of non-production-rate work is a common and adequate limitation for those persons who suffer from moderate difficulties in concentration, persistence, or pace." *Pruitt v. Comm'r of Soc. Sec.*, 2015 WL 5730023, at *7 (E.D. Mich. Aug. 24, 2015). Indeed, "the consistent trend in this District is to not remand a case on the premise that a claimant with a 'moderate' [CPP] rating cannot perform simple, unskilled, and routine jobs." *Weirauch v. Comm'r of Soc. Sec.*, 2021 WL 4497865, at *14 (E.D. Mich. Mar. 23, 2021).

In conclusion, the ALJ sufficiently articulated why Plaintiff's subjective complaints were not entirely consistent with the record, which is supported by substantial evidence. While Plaintiff points to evidence that supports his allegations of depression and anxiety, "[t]he fact that a record may also possess substantial evidence to support a different conclusion than that reached by the ALJ or that a reviewing judge might have decided the case differently is irrelevant." *Crisp v. Sec'y of Health and Human Servs.*, 790 F.2d 450, 452 n.4 (6th Cir. 1986).   Rather, the ALJ's evaluation of a claimant's subjective symptoms is entitled to "special deference," *Biestek*, 880 F.3d at 788, and cannot be disturbed absent

28

a "compelling reason." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013). As discussed above, no such compelling reason exists here, and the ALJ's findings are supported by substantial evidence in the record.

### ii. Opinion Evidence

Plaintiff next argues that the ALJ relied on "improper rationales to reject the opinion submitted by Stephanie Bright." (ECF No. 11, PageID.2940). On July 11, 2019, case manager Bright wrote a report stating that she began seeing Plaintiff on February 7, 2019, for his diagnosis of PTSD and recurrent Major Depressive Disorder. (ECF No. 8-7, PageID.1208). As detailed above, Bright noted in her report that it was "unknown" whether certain situations "cause" or "trigger" Plaintiff's symptoms other than that he "reports inability to be productive due to stress." (*Id.*). She opined that Plaintiff's "illness markedly restrict[s] daily activities" because "client reports symptoms restrict daily activities," and that his "illness markedly impact[s] upon the ability to sustain concentration and attention, resulting in frequent failure to complete tasks" because "client reports inability to independently complete phone calls or paperwork." (*Id.*, PageID.1209). Bright noted that she had "not observed [Plaintiff] in social situations" and that he "responds well to one on one interractions [sic]," but ultimately opined that he is unable to function in a full-time competitive work setting. (*Id.*).

The ALJ found Bright's opinion not persuasive, stating:

> In a Report dated July 11, 2019, Stephanie Bright opined that the claimant's illness markedly restrict daily activities and his ability to sustain attention and concentration. However, Ms. Bright noted that her opinion was based on the claimant's reports of functioning, with no reference to any specific symptoms or observed positive clinical

abnormalities. This opinion is found to not be persuasive for a number of reasons. First, Ms. Bright is not a medically acceptable source for purposes of disability evaluation. This assessment was also completed after the claimant had not been seen for therapy since February 2019. In fact, the evidence of treatment with Ms. Bright shows only two visits in July 2019, with a number of subsequent scheduled appointments being missed. Ms. Bright herself acknowledged that these restrictions were based solely on the claimant's subjective complaints and not any objective clinical findings. Furthermore, treatment notes did not show any positive clinical abnormalities that would be supportive of such severe functional restrictions.

(ECF No. 8-2, PageID.44) (citations omitted).[7]

Relevant to Plaintiff's application filed in September 2019, the applicable regulations provide that ALJs must rely on the following factors in assessing medical opinion evidence: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. 20 C.F.R. § 416.920c(a). Among these, "the most important factors" in this analysis are a medical opinion's supportability and consistency with other sources in the record. *Id.* § 416.920c(b)(2).

Here, the ALJ properly evaluated Bright's opinion, including assessing its consistency and supportability with the record evidence.[8] First, the ALJ properly

---

[7] Clearly, to the extent Plaintiff argues that the ALJ "ignored" Bright's opinion, that argument lacks merit. (ECF No. 11, PageID.2941) ("The mere fact that Ms. Bright is not a medically acceptable source does not mean that her opinion can be ignored.").

[8] Plaintiff's conclusory assertion (ECF No. 11, PageID.2940) that "[i]t is axiomatic that mental health symptoms are inherently subjective, and not detectable by objective means" lacks merit, as "[p]sychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated." *Plummer v. Comm'r of Soc. Sec.*, 2017 WL 3821751, at *2 (E.D. Mich. Sept. 1, 2017).

addressed the supportability of Bright's opinion by finding that "Ms. Bright herself acknowledged that these restrictions were based solely on the claimant's subjective complaints and not any objective clinical findings."  (ECF No. 8-2, PageID.44); *Hague v. Comm'r of Soc. Sec.*, 2022 WL 965027, at *4 (E.D. Mich. Mar. 30, 2022) ("The ALJ's observation that '[t]he doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what claimant reported' is a criticism of [the doctor's] explanation of his reasoning, or 'supportability.'  Because this criticism references [the doctor's] explanation in his evaluation, it is also specific enough for a court to review its logic"). The ALJ also properly addressed the consistency of Bright's opinion by finding that "treatment notes did not show any positive clinical abnormalities that would be supportive of such severe functional restrictions."  (ECF No. 8-2, PageID.44); *Hague*, 2022 WL 965027, at *4 ("Similarly, the ALJ evaluated the 'consistency' of [the doctor's] opinions in her determination that '[a]dditional treatment records demonstrate that, although the claimant continues to have ongoing mental health limitations, they are not as extreme as noted herein.'").  Finally, as discussed above, substantial evidence supports the ALJ's determination that Plaintiff suffered from, at most, moderate limitations in her mental functional capacity, and this provides "ample basis for upholding the ALJ's decision to discount [Bright's] opinion." *Urbanczyk v. Comm'r of Soc. Sec.*, 2017 WL 4296606, at *3

---

As detailed above, the medical record in this case contains numerous mental status exams documenting the severity of such psychological abnormalities as it relates to Plaintiff.

(E.D. Mich. Sept. 28, 2017).

In conclusion, substantial evidence in the record supports the ALJ's RFC finding and his handling of Bright's opinion.  While Plaintiff contends that there is evidence in the record that could show more than moderate mental limitations, where "the ALJ's opinion was supported by substantial evidence, it must be upheld, despite conflicting evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727 (6th Cir. 2013) (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012)).

## III.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(ECF No. 13)** be **GRANTED**, Plaintiff's Motion for Summary Judgment **(ECF No. 11)** be **DENIED**, and the ALJ's decision be **AFFIRMED**.


Dated: March 12, 2024                           s/David R. Grand
Ann Arbor, Michigan                             DAVID R. GRAND
                                                United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations set forth above.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).   Only specific objections to this Report and

Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 12, 2024.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager